AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Kansas

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>A Feit Electric WiFi LED Light Camera, bearing serial number<br>065247756. See Attachment A for a further description. | )<br>)<br>)<br>)<br>)<br>)     Case No.  23-M-6173-01-KGG |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
A Feit Electric WiFi LED Light Camera, bearing serial number 065247756. See Attachment A for a further description.

located in the _____ District of _____ Kansas _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ❑ evidence of a crime;
- ❑ contraband, fruits of crime, or other items illegally possessed;
- ❑ property designed for use, intended for use, or used in committing a crime;
- ❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251(a) | Production of Child Pornography |
| 18 U.S.C. § 2252A(a)(5)(B) | possession of and access with intent to view child pornography |

The application is based on these facts:

- ☑ Continued on the attached sheet.
- ❑ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Travis Putrah, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence via telephone conference..

Date: **Jul 21, 2023**

_____
*Judge's signature*

City and state:  Wichita, Kansas

Honorable Kenneth G. Gale, U.S. Magistrate Judge
*Printed name and title*

## <u>ATTACHMENT A</u>

### DEVICE TO BE SEARCHED

A Feit Electric WiFi LED Light Camera, bearing serial number 065247756, as shown below, seized from 2101 West MacArthur, Lot 303, Wichita, Kansas 67217 on or about July 6, 2023, currently at the Child Advocacy Center, 1211 S. Topeka, Wichita, Kansas.



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED**

1.       Any and all child pornography (as defined in 18 U.S.C. § 2256(8)), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

2.       Any and all child erotica, including documents, writings, and images or videos of children that do not qualify as child pornography but evince a sexual interest in children.

3.       Any and all documents, records, or correspondence, in any format or medium, pertaining to operation of the Kik and Yahoo accounts described in the attached affidavit.

4.       Any and all software, applications, computer related documentation, and passwords, that may be or are used to:

    a.       produce, distribute, receive, possess or access child pornography or visual depictions of minors engaged in sexually explicit conduct;

    b.       seek, obtain, store, or record information pertaining to the sexual exploitation of children or otherwise relate to an interest in child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children; and

    c.       communicate with any other person regarding child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children.

5.       Any and all data or information on the device, which may reveal indicia of ownership, access, or use of the account and websites described in the attached affidavit.

6.       Any and all notes, documents, records and correspondence pertaining to child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children, and to include any and all data or records that may reveal indicia of creation, use, or ownership of the notes, documents, records, or correspondence.

7.       Any and all documents, records, or correspondence that concern any accounts with an Internet Service Provider.

8.       Any and all records, documents, invoices and materials that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online

storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

9.      Any and all records, documents, invoices and materials that concern encryption, deletion, or destruction of evidence.

10.     Any and all visual depictions of minors that may assist in the identification of minors depicted in images of child erotica or child pornography.

## <u>AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT</u>

Your affiant, Travis Putrah, being duly sworn, hereby deposes and states the following:

### <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.     Your affiant is a Special Agent with Homeland Security Investigations ("HSI") and has been so employed since September 2019.

   a.   As a requirement for employment as an HSI Special Agent, your affiant successfully completed a twelve-week Criminal Investigator Training Program ("CITP") located at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. At the conclusion of CITP, your affiant also completed an additional twelve-week HSI Special Agent Training ("HSISAT") Academy. As part of the training at FLETC, your affiant received extensive instruction in the areas of Customs law, Immigration law and Criminal law.

   b.   Prior to your affiant's tenure as a SA with HSI, your affiant was employed as a Border Patrol Agent with the Department of Homeland Security ("DHS") from 2005 to 2019. From 2015 to 2018, your affiant was assigned to the Federal Bureau of Investigations' ("FBI") Indian Country Task Force in Bemidji, Minnesota. Your affiants' duties included investigating crimes of violence, to include death and assaults with deadly weapons; sexual assaults of juveniles, human trafficking, illegal trafficking of firearms and explosives; the manufacture, sale, and distribution of controlled substances; trafficking of child pornography; money laundering; arson; and the disruption/dismantling of violent gangs.

   c.   From 2018 to September 2019, your affiant was assigned to the HSI Task Force in Wichita, Kansas. While serving as an HSI TFO, your affiant was responsible for investigating federal violations of the trafficking of controlled substances; the production and sale of fraudulent documents; violations of immigration law; the theft of intellectual property; and the trafficking of child pornography.

### <u>PURPOSE OF THE AFFIDAVIT</u>

2.     This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for a **Feit Electric WiFi LED Light Camera, bearing serial number 065247756**, specifically described in Attachment A of this Affidavit, seized during the search of Brett MORGAN's residence on or about July 6, 2023, currently in the

possession of the Kansas Internet Crimes Against Children (ICAC), for contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2251(a) and 18 U.S.C. § 2252A(a)(5)(B), which items are more specifically described in Attachment B of this Affidavit.

3.     The statements in this Affidavit are based in part on information provided by other law enforcement officers and on my investigation of this matter.  Since this Affidavit is being submitted for the limited purpose of securing a search warrant, your affiant has not included each and every fact known to me concerning this investigation.  Your affiant has set forth only the facts that they believe are necessary to establish probable cause to believe that contraband and evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2251(a) (production of child pornography) and 18 U.S.C. § 2252A(a)(5)(B) (possession of and access with intent to view child pornography) are presently located on a devices located at the residence of Brett MORGAN (MORGAN), more specifically described in Attachment A.

## STATUTORY AUTHORITY

4.     As noted above, this investigation concerns alleged violations of 18 U.S.C. § 2251(a) and 18 U.S.C. § 2252A(a)(5)(B) relating to material involving the sexual exploitation of minors:

a.     18 U.S.C. § 2251(a) prohibits employing persuading, inducing, enticing, and coercing, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, using materials that have been mailed, shipped, and transported in and affecting interstate and foreign commerce by any means, including by computer.

b.     18 U.S.C. § 2252A(a)(5)(B) prohibits knowingly possessing, or accessing with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or

2

transported in or affecting interstate or foreign commerce by any means, including by computer.

## **DEFINITIONS**

5.     The following definitions apply to this Affidavit and Attachment B:

a.     "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

b.     "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c.     "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

d.     "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

e.     "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units; internal and peripheral storage devices such as fixed disks; external hard drives; "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer; and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

f.      "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

g.      "Hyperlink," as used herein, refers to an item on a web page or in a mobile application which, when selected, transfers the user directly to another location in a hypertext document or to some other web page or (part of) a mobile application.

h.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

i.      An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

j.      The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

k.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

l.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

m.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or

opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

n.    A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks; RAM; "thumb," "jump," or "flash" drives; CD/DVDs; and other magnetic or optical media.

o.    "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address. URLs are made of letters, numbers, and other symbols in a standard form. People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

p.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

6.    On or about July 4, 2023, Wichita Police Department (WPD) Detective Jonathan Elledge, assigned to Exploited and Missing Children's Unit (EMCU), was assigned to investigate the sexual assault of Minor Victim 3. MV3 has been identified as a minor residing in Wichita, Kansas, and would have been under the age of ten and prepubescent at the time of the sexual assault.

7.    According to reports, MV3 disclosed to MV3's mother that Brett Anthony Morgan (MORGAN) had licked MV3's "private." MORGAN began babysitting for MV3 on or about June 1, 2023. MORGAN has been babysitting MV3 at his residence, located in Wichita, Kansas. Minor victim 1 (MV1), who is under the age of 10 years old, often resides at the residence with MORGAN. MV3's mother immediately made a report with the Wichita Police Department.

8.    On or about July 4, 2023, MV3 was forensically interviewed at the Child Advocacy Center of Sedgwick County (CAC). During that forensic interview, MV3 disclosed that

5

MORGAN licked MV3's "private" more than one time at MORGAN's residence.  MV3 was shown an anatomical diagram of a child and identified the genitalia on the diagram as the "private."

9.     MV3 disclosed that MORGAN pulled MV3's pants and underwear down, used his hands to spread MV3's legs, and used his tongue to lick MV3's private.  MV3 disclosed that MORGAN's tongue went "inside" MV3's genitalia.

10.    MV3 disclosed that MV3 tried to keep their legs together on one occasion and that MV1 helped MORGAN spread MV3's legs apart.

11.    MV3 disclosed that MORGAN had exposed his penis to MV3 and asked MV3 and MV1 if they wanted to suck and play with his penis.

12.    MV3 also disclosed that MORGAN has asked to take a photograph of MV3's "private" with his cellular telephone.  MV3 also stated that MORGAN had recorded MV3, while clothed, using his cellular telephone.  MV3 described MORGAN's cellular telephone as being red and black.

13.    MV3 disclosed that when MORGAN licked her "private", it occurred on MORGAN's living room couch and the living room floor.

14.    On or about July 4, 2023, MV1 was forensically interviewed at the CAC.  MV1 disclosed that MV1 witnessed MORGAN attempt to touch MV3's genitalia at MORGAN's residence while MV3 and MV1 were in bed together.  MV1 disclosed that MV1 taught MV3 how to cover themselves up when MORGAN tried to touch their genitalia.  MV1 demonstrated this by hold their arms in such a way as to cover their chest and genitalia.

15.    On or about July 4, 2023, Detectives interviewed MORGAN at the CAC.  Detectives observed that the cellular telephone MORGAN had in his possession was in a red and black case as described by MV3.  MORGAN declined to be interviewed without a lawyer present.

Detectives seized MORGAN's cellular telephone to prevent the destruction of evidence.  On July 5, 2023, Detectives obtained and executed a search warrant on MORGAN's black Samsung mobile phone in a red and black case.

16.     On or about July 6, 2023, the Kansas Internet Crimes Against Children (ICAC) digital forensic unit (DFU) forensically examined MORGAN's cellular telephone.  During a review of the extracted content, detectives located the following child exploitation videos and images:

      a.     File "1674957420208" is a video file approximately 22 minutes and 41 seconds in length.

          i.     The video has a timestamp of January 28, 2023.  The video shows MV1 and Minor Victim 2 (MV2) in a bathtub inside MORGAN's residence.  Both minors are naked inside the bathtub.  MV1 starts to touch MV2 genitals.  MV2 tells MV1 to stop.  MV1 asks, "What did you feel?"  MV2 states, "I felt you trying to F-me".  MV1 states, "We're supposed to do stuff".  MV2 states, "We don't have to".  MV1 states, "I told [MORGAN] to make that a rule".  MV2 states, "[MORGAN] told me to do [unintelligible] and I already completed it.  I already completed what [MORGAN] told me to do."  MV1 states, "Yeah but I think he meant more stuff."  MV1 begins to move soap bubbles away from MV2's genitals.  MV2 tells MV1 to stop.  MV2 covers their genitals with their hand and states, "only I get to touch it".  MV1 asks MV2, "what can I touch on you".  MV2 tells

MV1 that they can touch their legs.  MV1 asks MV2 if they can touch MV2's butt.

ii.      MORGAN enters the room and begins to assist MV2 with rinsing their hair.  MORGAN begins to comb MV2's hair with a hairbrush. While combing the hair, MORGAN places the hairbrush in-between MV2's legs near their genitals.  MV2 screams, "Stop!  Stop aiming for that."  MORGAN puts the hairbrush in-between MV2's legs near MV2's genitals three more times.  Each time MV2 tells MORGAN to stop.  MV2 asks MORGAN why he continues to aim specifically for their genitals and MORGAN responds that he does not know.

iii.      MORGAN asks MV1 and MV2 if they have looked in the "light" to see if they have "hair there" referring to the minor's pubic hair. MORGAN points at the video camera and states, "the light's right there, so you can see it better".  MORGAN directs MV1 to use the light to look for pubic hair.  As set forth below in paragraph 32 (i), law enforcement found a wireless light bulb camera during the search of MORGAN's home.

iv.      MV1 stands on the side of the bathtub to get close to the "light". MV1 spreads their legs and displays their genitals to the video camera.

v.      MORGAN directs MV1 to get down and directs MV2 to use the "light" to look for pubic hair.

vi.     MV2 stands on the side of the bathtub to get close to the "light". MV2 displays MV2's genitals to the video camera.

vii.    MV2 exits the bathtub and begins to dry off.  MORGAN asks MV2 if they looked in the light for pubic hair.  MV2 states that they have. MORGAN asks to see MV2's genitals to look for pubic hair.  MV2 states that MORGAN is not their father.  MORGAN states that he is only looking and will not touch their genitals.

viii.   MORGAN directs MV2 to get back into the bathtub and look for pubic hair using the "light".  MV2 stands on the side of the bathtub to get close to the "light" and displays their genitals to the video camera.

ix.     MORGAN directs MV2 to spread their genitals.  MORGAN states, "Pull it up and spread it, let me see.  Cause it looks like you got some right there too.  Spread it open."  MV2 spreads their genitals in front of the camera.  MORGAN's finger can be seen in the video pointing at MV2's genitals and directing MV2's actions.

x.      MV2 tells MORGAN that they are having a hard time bending to display their genitals to "the light".  MORGAN states, "you can lay on the floor and do it."

b.      The ICAC digital forensic examiner also located 6 child exploitation images on MORGAN's cellular telephone.  File "0115232324b" is an image file. The image shows a close-up of a prepubescent female child's vagina.

Hands are spreading the child's labia apart, showing the vulva and vaginal opening.

    i.       According to the images' meta data, the image was captured using an LG LM-V600 cellular telephone.  As set forth below in paragraph 32 (c), a similar make and model LG phone was seized during the search of MORGAN's residence.

    c.     Additional screen captures or screenshots of MV2 undressing were located on MORGAN's telephone.

    i.       According to the image's meta data, the image was created using an LG LM-Q720 cellular telephone.  As set forth below in paragraph 32 (c), a similar make and model LG phone was seized during the search of MORGAN's residence.

17.    DFU located the child exploitation images and videos in a hidden folder within the Google Photos application.  The folder was locked using a passcode or PIN.  Once the PIN is entered, the locked folder can be opened and the files are viewable.

18.    During the examination of the data extracted from MORGAN's telephone, the application "Feit Electric" was located.  Inside the application, a profile for a "bulb camera" was observed.

19.    According to the developer, the Feit Electric application can control and manage your LED Smart Wifi bulb from anywhere using the application.

20.     DFU    also    located    a    cached[1]    image    with    a    file    path "data/com.feit.smart/cache/Camera/Cover".  It was found to be associated with the Feit Electric application.

21.     This cached image is a captured image, similar to a screenshot, from a video.  It appears to have the same or similar characteristics observed in the video set forth above in paragraph 16(a).

22.     The cached image appears to be a single image of a video recording of MV1 and minor victim 5 (MV5).  MV1 and MV5 are naked and in MORGAN's bathtub.  The timestamp "April 6, 2023" can be seen in the cached image.

23.     Investigators have identified MV5 and learned that they would have been under the age of 12 at the that time.  Additionally, MORGAN had access to MV5 at his residence beginning on or about March or May of 2021.

24.     Forensic examiners did not locate a video on MORGAN's device that matched the cached image set forth in paragraph 21-23.

25.     The discovery of this cached image has led investigators to believe that it is probable that additional child exploitation videos were produced by MORGAN utilizing the light bulb camera or other devices.

26.     On July 6, 2023, law enforcement executed a search warrant, issued in the 18th Judicial District Court of Sedgwick County, Kansas; reference case number 23C070549; on MORGAN's residence in Wichita, Kansas.

---

[1] Cache – is the location where a device stores images, code, and other files to help a device run faster.  An image/video cache will remain in the cache folder even after a user deletes the original image/video file from the device.  Cache images are not typically viewable to the device user and usually found in the device's file system.

27.     Prior to entry into the residence, law enforcement observed a video camera installed in the residence's front porch light.  After the entry into the residence, investigators located a Samsung model SM-G991U cellular telephone capturing live video from the front porch light security camera.  It appeared that the video camera was utilizing a wireless signal to connect to the cellular telephone.  Additionally, the Samsung mobile telephone appeared to be utilizing a wireless signal at the residence to capture the camera's live video.

28.     Law enforcement located a black video camera installed on the residence's kitchen wall.  The video camera was angled to capture video from the residence's living room.  This would be the same living room that MV3 disclosed that when MORGAN licked her "private", it occurred on MORGAN's living room couch and the living room floor, as set forth above in paragraph 13.

29.     The video camera appeared to utilize a wireless signal to connect to digital devices.

30.     A Hewlitt Packard (HP) laptop was located during the search.  The laptop was powered on and connected to the residence's wireless network when located.

31.     The following items of evidence were located and seized from the residence on or about July 6, 2023:

      a.    Front porch light camera.

      b.    Black video camera installed on the kitchen wall.

      c.    Eleven (11) cellular telephones; to include but not limited to:

            i.    An LG cellular telephone of similar make and model to the cellular telephone used to capture the above-listed child exploitation images referenced above in paragraph 16(b);

   ii.  An LG cellular telephone of similar make and model to the cellular telephone used to capture the child exploitation image referenced above in paragraph 16(c);

   iii.  A Samsung model SM-G991U capturing live video from the front porch.

d.  One HP laptop.

e.  Three (3) tablets;

   i.  1 Blu model M8L 2002;

   ii.  1 Intel Nextbook, and

   iii.  1 Ellipsis tablet.

f.  One (1) Toshiba external hard drive.

g.  One (1) Sandisk secure digital (SD) memory card.

h.  One (1) Sandisk Cruzer thumbdrive.

i.  A Feit Electric Wireless Light bulb camera.  A smart Wi-Fi camera is integrated into the LED bulb.

   i.  A stock image that looks identical to the light bulb seized is provided below.



       ii.       According to the manufacturer's documentation for the light bulb camera, it connects to devices using a wireless signal. Additionally, the light bulb camera can store recorded video using a MicroSD card.

32. During the search of the residence, law enforcement observed a floor lamp inside the bedroom attached to the bathroom where the video set forth in paragraph 16(a) had been produced. Investigators moved the floor lamp and placed in on the floor next to the bathtub. The floor lamp appeared to have been set at the same height and angle in which the bathtub videos were produced.

33. On or about July 12, 2023, minor victim 2 (MV2) was identified by law enforcement and forensically interviewed at the CAC. Investigators learned at that time that MV2 would have been under the age of 12 at the time video "1674957420208" (video from paragraph 16(a)) was produced. During the forensic interview, MV2 identified themselves and MV1 in the video described in paragraph 16(a). MV2 also identified MORGAN in the video described in paragraph 16(a). MV2 stated that they did not know they were being recorded while in the bathtub. MV2 stated that there was a floor lamp where the camera was positioned. MV2 provided a description of the floor lamp. MV2 stated that they did not know there was a camera there and stated that they always look for cameras because they are afraid of being watched. MV2 also identified the comb used by MORGAN in the video described in paragraph 16(a).

34. MV2's description matches the description of the floor lamp previously observed at MORGAN's residence during the execution of a search warrant on July 6, 2023. On or about July 13, 2023, law enforcement executed a second search warrant at MORGAN's residence and seized the floor lamp and multiple hairbrushes and combs.

14

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

35.     Based on your affiant's experience in the investigation of computer-related crimes and the discussions your affiant has had with other investigators who have experience in investigations related to child exploitation, your affiant knows the following:

      a.    Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

      b.    Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth."  Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone, or transferred to external storage devices, such as a USBC.  These memory cards and USBC devices are often large enough to store thousands of high-resolution photographs or videos.

      c.    A modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections.  Electronic contact can be made to literally millions of computers around the world.  Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

      d.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  Electronic storage media of various types - to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution.  It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices.  Some media storage devices can easily be concealed and carried on an individual's person.  Smartphones and/or mobile phones are also often carried on an individual's person.

e.    The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.    Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g.    A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps." Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device. Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

h.    As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (*i.e.*, by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

36.    Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who produce and access online child sexual abuse and exploitation material:

a.   Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b.   Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.   Such individuals almost always possess and maintain child pornographic material in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain those materials and child erotica for many years.

d.   Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly.  Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

e.   Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools.  Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[2]

---

[2] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

f.  Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain contact information (e.g. online messaging accounts, email addresses, etc.) of individuals with whom they have been in contact and who share the same interests in child pornography.

g.  Such individuals prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world

h.  In my training and experience conducting child exploitation investigations, I am aware that persons who receive, possess, and distribute images of child pornography sometimes utilize email accounts and online "cloud" storage to correspond with other persons sharing similar interests; and that those persons sometimes utilize those email accounts and online "cloud" storage to receive, transmit and store images of child pornography.  Cloud-based storage can be utilized by child pornography distributors/possessors to add a layer of anonymity to their actions, as well as attempt to conceal the trading and collecting of child exploitation material from law enforcement.

i.  Even if the subject uses a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found in the target's home, including on digital devices other than the portable device (for reasons including the frequency of "backing up" or "syncing" mobile phones to computers or other digital devices).

37.  According to minor victims, MORGAN utilized his residence to facilitate the production of child exploitation material.  Furthermore, due to the minor victim's statements and observations made by law enforcement, I believe that the camera's seized during the search of his residence were used to facilitate the production of child exploitation material.

a.  I believe that the light bulb camera was utilized to produce child exploitation videos of the minor victims inside the bathtub.

b.  I believe that it is probable that the camera on the kitchen wall could have captured video of MV3 being sexually assaulted on the living room couch

and floor.

    c.     I believe that the front door security camera could provide investigators with additional information on the dates and times minor victims were at MORGAN's residence.  It could also provide investigators with the identity of additional minor victims.

38.    I believe that MORGAN utilized a wireless signal inside his residence to produce child exploitation material.  During the execution of a search warrant at this residence, multiple devices were connected to a wireless signal at the residence.  Some devices were actively capturing images/videos during the execution of the search warrant.

39.    I believed that it is probable MORGAN utilized additional digital devices, such as laptop computers and mobile devices, similar to the ones located and seized at his residence, to produce the child exploitation material law enforcement located on his cellular telephone.

40.    I believe that MORGAN produced additional child exploitation material that investigators have not yet located.  I believe this is probable after locating the cached image as set forth above in paragraphs 20-25.  I believe it is probable that evidence of that production is located on the laptop, tablets, mobile devices, cameras, and storage mediums seized from MORGAN's residence.

**SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS**

41.    As described above and in Attachment B, this application seeks permission to search for records that might be found in the items listed in Attachment A, in whatever form they are found.  One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of

electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

42.     Your Affiant submits that there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons:

a.     Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

43.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of

their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the item listed in Attachment A because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b.    Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device

21

connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., Internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

44.     Based upon your affiant's training and experience, and information relayed to your affiant by agents and others involved in the forensic examination of computers, your affiant knows that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.  Your affiant also knows that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

      a.    Searching computer systems is a highly technical process that requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

      b.    Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

      c.    The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

      d.    Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file

contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

45.     Additionally, based upon your affiant's training and experience and information relayed to your affiant by agents and others involved in the forensic examination of computers, your affiant knows that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime.  This is equally true of wireless routers, which create localized networks that allow individuals to connect to the Internet wirelessly.  Though wireless networks may be secured (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or unsecured (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network.  Moreover, your affiant knows that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

46.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your affiant is applying for would permit seizing, imaging, or otherwise copying storage media that

reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

47. Your affiant submits that this affidavit supports probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in **Attachment B**, are located in or at the location described in **Attachment A**. I respectfully request that this Court issue a search warrant for the location described in **Attachment A**, authorizing the seizure and search of the items described in **Attachment B**.

Respectfully submitted,

Travis Putrah, Special Agent
Homeland Security Investigation

Attested to by the Affiant, in accordance with the requirements of Fed.R.Crim.P. 41(d)(3), by telephone or other reliable electronic means, to wit: telephone conferencing on July **21**, 2023.

HONORABLE KENNETH G. GALE
United States Magistrate Judge
District of Kansas

## ATTACHMENT A

### DEVICE TO BE SEARCHED

A Feit Electric WiFi LED Light Camera, bearing serial number 065247756, as shown below, seized from 2101 West MacArthur, Lot 303, Wichita, Kansas 67217 on or about July 6, 2023, currently at the Child Advocacy Center, 1211 S. Topeka, Wichita, Kansas.



## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED

1.      Any and all child pornography (as defined in 18 U.S.C. § 2256(8)), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

2.      Any and all child erotica, including documents, writings, and images or videos of children that do not qualify as child pornography but evince a sexual interest in children.

3.      Any and all documents, records, or correspondence, in any format or medium, pertaining to operation of the Kik and Yahoo accounts described in the attached affidavit.

4.      Any and all software, applications, computer related documentation, and passwords, that may be or are used to:

        a.    produce, distribute, receive, possess or access child pornography or visual depictions of minors engaged in sexually explicit conduct;

        b.    seek, obtain, store, or record information pertaining to the sexual exploitation of children or otherwise relate to an interest in child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children; and

        c.    communicate with any other person regarding child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children.

5.      Any and all data or information on the device, which may reveal indicia of ownership, access, or use of the account and websites described in the attached affidavit.

6.      Any and all notes, documents, records and correspondence pertaining to child pornography, visual depictions of minors engaged in sexually explicit conduct, child erotica, or the sexual exploitation of children, and to include any and all data or records that may reveal indicia of creation, use, or ownership of the notes, documents, records, or correspondence.

7.      Any and all documents, records, or correspondence that concern any accounts with an Internet Service Provider.

8.      Any and all records, documents, invoices and materials that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online

26

storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

9.      Any and all records, documents, invoices and materials that concern encryption, deletion, or destruction of evidence.

10.     Any and all visual depictions of minors that may assist in the identification of minors depicted in images of child erotica or child pornography.